They are now ready for argument in Friends of Animals v. Silvey and Ms. Best, I don't know if you were able to listen to the previous argument, but if you were, to the extent that you can build from that instead of repeating what was said, that would be perhaps helpful. Okay, so with that, please begin when you're ready. Jennifer Best May it please the Court, I'm Jennifer Best on behalf of Appellants to Friends of Animals and I would like to reserve three minutes for rebuttal. As mentioned, Your Honor, I would like to start by building on a few points why the unique and unknown risks associated with this action mandate preparation of an In addition, I would also like to address why this action violates the Administrative Procedure Act and the Wild Free Roaming Horses and Burros Act. Those issues involve some unique and novel legal issues that have significant on-the-ground impacts. Notably, decisions to remove wild horses have always benefited from public input and have always been reviewable from the courts. And with this decision, BLM proposes to remove those decisions from the public, make them behind closed doors, and prevent judicial review for the next 10 years. But to start with, kind of building on the unique and unknown risk factors, I would like to point out that in the Ninth Circuit, the law is clear that preparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where collection of data may prevent speculation on potential effects. This is the National Parks Conservation Association v. Babbitt, also stated in Ocean Advocates v. United States Army Corps of Engineers. BLM here doesn't dispute that there are unique and unknown risks with returning gelded wild horses to the range. Moreover, it cannot be disputed that this is a type of uncertainty that can be resolved by the further collection of data. This is not the type of uncertainty that's always present in the natural world. Otherwise, there would have been no reason for BLM to conduct a study on this. BLM here has, in fact, started a study. Why does it rise from the level of uncertainty to highly uncertain? Well, as mentioned before, there are significant studies like the National Academy of Science, as well as experts in the field who have said this could have detrimental impacts on wild horses. It is highly uncertain if something is unique or unknown that can also warrant preparation of an environmental impact statement. Here, it's not disputed that the unique and unknown risk factors are present. In fact, BLM has stated multiple times in an environmental assessment that it is unknown what the impact will be on the wild horses that are gelded as well as the wider population. They have also said that there is currently no study with the results available on the effect of the behavior of gelded wild horses pre- and post-castration. In the study that they have already initiated, they said they're going to initiate a study because it will help inform better management of wild horses. Therefore, this is the type of information that can be resolved by further study. Once BLM concedes that this can be resolved by further study, then the Ninth Circuit mandates preparation of an environmental impact statement. Moreover, as was touched on a little bit by counsel in the prior case, this goes to the heart of the purpose and need of this action. For example, the purpose and need is to reduce the population growth rate and also to restore a thriving natural ecological balance. Here, when there is uncertainty involved, will this restore a thriving natural ecological balance or will it in fact have a reverse effect? For example, in the record, BLM stated in past cases that it is very likely that gelded wild horses could congregate around water areas. They wouldn't move around as much as they did later. In this instance, it would actually benefit the horses and the range more if they returned horses that were not gelded rather than returned as gelded horses. Overall, we're not saying BLM has to pick one expert over the other. What we're saying here is that the record is clear that these are substantial questions that go to the heart of this action and that mandate preparation of environmental impact statement. Along those lines, I would also like to talk about how the finding of no significant impact in this case is both unconvincing and contrary to the evidence. If the court looks at the finding of no significant impact, BLM does not address any of these issues at all. It merely says the impacts are well known and understood. As mentioned earlier, this contradicts all the evidence in the record. This contradicts BLM's own EA where it says this has not been This does involve unknown risks. Therefore, under the Administrative Procedure Act, this is a textbook example of arbitrary and capricious decision making that's not supported by the record and it's not the convincing statement that is necessary when an agency decides not to prepare an environmental impact statement. If the court doesn't have any further questions about the unique and unknown risk factors, I would also like to move on to how this action violates the Administrative Procedure Act and the Wild, Free, Roaming Horses and Burros Act. Before you leave that, I'm going to ask you the same question I asked to the government council, which is, is there any significance in the analysis to the fact that the statute uses the word human environment? Ultimately, there has to be a significant effect on the animal behavior constituted an effect on the human environment? Your Honor, as the council indicated previously, that term has been interpreted broadly and it is the interaction between humans and the environment and humans and the animal. I will say that the Ninth Circuit in, let me find the case real quick, where the Ninth Circuit said there's no question that impacts the wild horses, impact the environment. The question is whether specific action does so significantly. That kind of gets to the heart of the matter that yes, this is an impact on the human environment. And that's not an argument I don't believe that either party has raised in the briefing. Is that your understanding as well? Correct. I think both parties agree that the human environment is in play here and that impacts to wild horses do impact the human environment. Notably, Congress declared when it passed the Wild Free Roaming Horses and Burros Act that wild horses enrich the lives of the American public and that wild horses need to be considered an integral part of the public lands. So that further supports the position that impacts to wild horses do impact the human environment. There was also another case, American Wild Horse Preservation Campaign versus Zinke where the court found that the impacts to wild horse behavior of sterilizing those wild horses required a harder look under the National Environmental Policy Act and that the agency needed to take a further look at an environmental impact statement. So that case is kind of directly on point saying these are the type of impacts that are significant under NEPA and that the agency does need to consider. And the case I was talking about previously, sorry for the delay there, was American Horse Protection Association versus Andres and that was at 608 F2D 811. And that's where the Ninth Circuit said it cannot be denied that the removal of substantial wild horses will affect the quality of the human environment as that quality is viewed by Congress. Moreover, I would next like to get to how this action is a significant departure from the agency's past policy and that it must be set aside because they did not explain or provide good reasons for that departure. Notably, BLM argues that it has discretion to authorize an infinite number of separate maintenance gathers under a single decision with no commitment for further public involvement and no opportunities for further judicial review. And this is contrary to the plain language in the binding land use plans in their handbook and in their past litigation position. There's really no genuine dispute that this policy change is not supported and is not a reasoned explanation as the Supreme Court laid out its factors in FOX saying that when an agency changes position, it must display awareness that it's changing position, show that the new policy is permissible under the statute, and also provide good reasons for the new policy. Here, the court needs to go no farther than the first element. BLM has never even displayed an awareness that it's changing its policy. Therefore, this is the exact type of unreasoned decision making that must be set aside. How did the BLM change its policy here with the gather plan? Traditionally, BLM has always involved the public and prepared a NEPA documentation for every individual roundup or gather. Here, in contrast, BLM is saying we're going to issue one decision that authorizes multiple roundups and gathers, unlimited, they don't specify, it's very open-ended, over a period of 10 years. So, with each of these subsequent roundups and gathers, they're not taking comments from the public and they're not preparing environmental assessment. Notably, the Ferry Springs Wild Horse Territory Management Plan, which BLM does not dispute, the Binding Land Use Plan, says a wild horse gather plan will be approved for each gather. That's in the record, excerpts of the record 5-4. So, where here the plan says you have to approve a plan for each gather, BLM is not doing that here. It's approving one decision for multiple gathers, not each gather. This is also specified in their handbook, where it says that they will take public input for 30 days. It also says that all gather decisions will be issued no more than 76 days before the start of a gather. BLM has expanded on this in past litigation and said, because of these policies, because of our handbook, we can't issue one decision that's going to last multiple years. That would mean the decision was issued more than 76 days before the gather. Here, BLM is reversing that position without ever acknowledging that position and saying, hey, we issued one decision in 2017 and that decision is good for 10 years. Because they never explained why they're changing their policy, it is arbitrary and capricious. Again, this has real-world impact because BLM has limited resources. It can and has made mistakes in the past. For example, in the case here, they made mistakes about what the Wild Horse and Burrow Act boundaries were, and it was members of the public who caused those mistakes. Members of the public care deeply about these horses, so they have the resources. They're out there on the ground, they're out there in the course of the horses, even flying over to count the population and looking at their range. So, it is important to catch these mistakes that BLM makes and help BLM make an informed decision. You're down to under three minutes. If you want to save rebuttal time, you may, or you may use it now. I will save the rest of my time for rebuttal. Thank you, Your Honor. Thank you. We'll hear from the government. Good morning again, Your Honors, and may it please the Court. Respectfully, the Department of Animals' argument on highly uncertain effects or effects that involve unique or unknown risks is quite similar to the campaign's, and it is effectively that any uncertainty requires NEIS, and that is quite simply not the law. If National Parks v. BABBITT does not support that proposition, that is the case they rely on. The effects there, as I've explained previously, are a far cry from the effects at issue here, and they have cited no case. They have cited no case illustrating effects comparable to the ones at issue here. Finding an EIS is required. Ocean Advocates v. U.S. Army Corps of Engineers, on which they rely, they're the amount of oil tanker traffic that might result from the construction of an extension to an oil refinery dock in Puget Sound was found to be largely unknown. Again, this case does not present a possible severe increase in pollution or oil spills or anything of that nature. The effects on animal behavior, BLM made reasonable predictions based on numerous studies. The record demonstrates that, and there's not a comparable level of uncertainty. And respectfully, Your Honors, were it the case that any uncertainty about any effect, regardless of the effect's significance, required an EIS, then an EIS would always be required. They have taken the statement from National Parks out of context, and it's not an accurate representation of the case or the law in the circuit. And I'd also like to go back, if I could, to the record. In National Parks, again, there were studies in the record that contradicted the agency's conclusions, and that is not the case here. And also, it's an important principle of environmental law that an agency is required to consider factors. And under NEPA, an agency is required to consider effects. An agency is not required to cite particular sources or particular statements in a particular source to a plaintiff's satisfaction. There is no question on the record that BLM considered the effects of gelding for purposes of NEPA. The Wild Horse Act does not actually require that, so that's an important point to make. The Wild Horse Act does not require BLM to study gelding's effects. BLM is doing that proactively in order to improve its management program. But the NAS report, again, it reaches no conclusion on gelding's effects of a herd. It says that it may increase reproductive success. It acknowledges the other possibility, it may decrease reproductive success. I would direct this court to this court's 2014 decision in defense of animals, 751 F3-1054-1071. This court rejected an analogous argument that studies on PZP that identified only possible effects of the vaccine and ultimately reached no conclusion as to its effects demonstrated the existence of unique or unknown risks. And the court should do the same here. Mere statements in the record, something is possible, have never been held a decision of which we are aware, and plaintiffs have cited none to be sufficient to demonstrate the requisite high uncertainty. And so there is nothing in the record to support their argument. There is nothing in the case law to support their argument on that point. And what about the, Ms. Best's point on the APA, that the BLM has never had a 10-year gather plan, study for each gather. What's your response to that? They are wrong again, both on the facts and the law. BLM has done 10-year gather plans previously. It has, and since, as we've explained in our briefs, BLM's approach to wild horse management is a work in progress. It is evolving. BLM has responded to the NAS report's recommendations and the recommendations of other agencies to incorporate fertility controls into its management. And the point of that, your honor, is to ultimately reduce the number of horses requiring removal. And also, of course, there is the practical problem. BLM cannot remove 8,500 horses at once and put them in long-term holding, and Friends has never contested that. So BLM, so, but the point of fertility controls, your honor, is that they take time to work. And so actually on, you know, we've explained in our brief, even footnote one on page one of numerous instances in which BLM has used a phased approach and conducted multiple and authorized multiple roundups in a single gather plan. That, it is completely untrue that this is a first. BLM has done it many times before. It is also incorrect that anything in the land use plans or the handbook prohibits BLM from doing that. Their argument on this point is that BLM has limited its own discretion, has itself prevented itself from utilizing multiple roundups, and we've explained quite clearly in the land use plans and the handbook that BLM has not done that. BLM has committed to do NEPA for all gather decisions and for all roundups. And this gather plan, they had, you know, it's also important on this point, I think, they haven't explained what they aren't able to say. The procedures that BLM will utilize in all of these roundups are set forth in this gather plan. BLM has annual hearings on the use of helicopters and vehicles in which they are free to participate. BLM also does a press release for every roundup. So it's, you know, the suggestion that BLM will be doing this in secret is untrue. BLM has not prohibited itself from doing this. It doesn't, it's not a lot, there's no logical reason why it would have. And so it's both factually wrong and it's also legally wrong. You know, they say that a heightened explanation is, I mean, you know, one, there is no change. There's no change in the agency's practice. It's quite simply an evolution that BLM has been doing for quite some time. I think, you know, and in defense of animals, again, BLM has been utilizing fertility control since at least 1992. So, but also when you look at, you know, FOX and cases applying it, they address substantive changes in official agency policies. But by contrast, this court has held that it does not apply, and this is Sierra Club v. BLM, 786 F3, 1219, 1226, to an agency's evolving analysis that is not a change in a published regulation or official policy. So even assuming, Your Honors, that BLM has, you know, that its process has evolved and changed, it's not the kind of change for which a heightened explanation is required under FCC. You know, and even further, Your Honors, BLM explained the reasons in the record for why it is using a phased approach in this instance, and it includes both the practical reality, the impossibility of removing 8,000 plus horses at one time, and also the efficiencies that are anticipated to be gained from the use of fertility controls, and again, hopefully, to remove fewer animals than would otherwise be necessary if BLM did it all at one time. So BLM, you know, has, and again, Friends of Animals doesn't contest the rationality of that argument, argued that that was arbitrary and capricious as an explanation, and so respectfully, Your Honors, nothing more than that was required under the APA, but even if BLM, you know, was required to explain why it's not using a single gather in this instance, the record contains that explanation. It's impossible and there are inefficiencies to be gained from the use of this phased approach. Well, let me ask you this. Isn't there one study that the BLM has commissioned that's not due till October of this year? The Congress study, Your Honor, I think you're referring to, it's in its final observation year, correct? I think this year to 2021, the results are going to begin to be analyzed, and ultimately, there's going to be, it's anticipated that there will be published in peer-reviewed journals, but again, Your Honor, I think it's really important to stress the point that BLM is undertaking a study on its own initiative in order to improve its management of wild horses, does not demonstrate that that is an effect that must be analyzed under NEPA in an environmental impact statement. They are two completely separate issues, you know, and it's, BLM should not be faulted for undertaking the Congress study, you know, it's working to improve its management. Adaptive management is something that the plaintiffs advocate, and BLM is working to improve its knowledge, but it should not- Does that indicate any high degree of uncertainty? I guess that would be the point, I guess, that your opposing counsel would make. Respectfully, Your Honor, it doesn't, because highly uncertain, you know, what BLM is trying to determine is whether this may be effective management tool to slow population growth when used in combination with other measures, right? So here, BLM has proceeded very cautiously, and we've explained in our briefs, BLM is not using gelding in this gather plan in order to achieve the appropriate management level. It is simply authorizing a limited number, and again, it's a management decision. Rather than try to bring the population down to the low appropriate management level range of 899, this provision authorizes the management level to go up to the mid-range, which is 1,200 and some, and some geldings to be released. So BLM is proceeding quite cautiously and responsibly by studying this method and whether it might be an effective tool, but here, only, you know, and again, with respect to NEPA, Your Honor, the purpose of this factor is to determine whether an effect, an action's effects are so severe or so, that an environmental impact statement may be required. And so here, it is not known exactly how gelded horses will behave and how the social that, sort of, the range of what is unknown is quite well defined and quite clear. And it's not, again, when you look at the cases, when you look at ocean advocates and national parks and bark, this, none of these cases, you know, have effects, anything like this. And again, we'd ask the court to look at indefensive animals because that case, like this one, involved a large-scale gather plan. And there, like here, the overall, the effects of the plan, the goal of the plan is to restore this driving natural ecological balance to the range. And so, like, you know, this gather plan is really no different. And in that gather plan, too, it did not use gelding, Your Honor, but it did use sex ratio adjustments, and that is what element of this plan, too. It utilized sex ratio adjustments. It utilized fertility control. It was a large-scale gather. And here, the effects are really the same. And BLM, again, has extensively, you know, the other point of this is that this, the record is very thorough. And this is not something that BLM brushed off. It is not something that BLM didn't consider. BLM considered it quite thoroughly. It's a long EA, so it's not clear what more there is. And, you know, again, the fact that BLM is studying it and, you know, working to determine whether it may be another tool to use or to use, you know, differently, or it's a separate question from whether it's highly uncertain or the risks are unique. Did the gather plan in this other case, did it require an EIS or not? No. No, Your Honor. And so, and I think that case is quite, you know, and it also looked directly at this issue of uncertain, highly uncertain, and rejected the argument, and for a very analogous reason. So in that case, there were, the plaintiffs argued that the effects of PZP were uncertain because some studies identified possible effects. And that's exactly what's happening here. The plaintiffs say, oh, the NIS report says this is possible. Possible isn't sufficient to demonstrate this existence of highly uncertain or unique or unknown risks. And I mean, unique, Your Honor, the risks are not unique. The risks are, you know, gelding again, it's been used for thousands of years to show how horses behave. And again, it's quite a common sense proposition, and it's explained that, you know, it's social experiences before impact how a horse behaves after. And so there's studies in the record, there's, and BLM, you know, addressed these studies. Thank you, counsel. Ms. Best, do you have some rebuttal time remaining? Your Honor, just really quick, the uncertainty. This is not similar to in defensive animals, whereas counsel admitted gelding was not at issue in this case. Here, the real uncertainty is returning gelded horses to the range where they are, need to manage life as a wild horses. As experts have repeatedly said, this is not the same thing as gelding domestic horses, where they're in an extremely different environment. And the fact that BLM is undertaking a study is relevant because it shows that this is not the type of uncertainty that is always present. This is a type of uncertainty that can be resolved by further data. And there is a case on point about this. It's the American Wild Horse Preservation Campaign versus Zinke at 2017 U.S. District Lexus 161599. And contrary to in defensive animals, that did involve sterilizing wild horses much more on point and said that further review under NEPA was warranted. Next, I would like to also talk about how they have changed their policy. They keep saying they need multiple actions and that fertility control takes time, but none of this provides a justification for why the public can't be involved in these decisions. And that's how BLM has changed its policy. Before, it always involved the public. And now, for the next 10 years, it's not going to issue any more NEPA documents. It's not going to involve the public to catch these mistakes. Noticing, putting a press release out the day of or the day before is not the same thing as providing NEPA documentation. Nor is it similar to the Sierra Club where there was an evolving analysis regarding a single project. Here, we're talking about past policy, official policies in their handbook, in their land use plan. They never explained why they're departing them. Never explained why these phases can't involve the public. This has a huge on the ground impact for people who care about these wild horses. Moreover, under the Wild Horses and Burrow Act, it mandates how these decisions are made. Discretion is not unbounded. It said that BLM has to make these decisions based on current information that not only there's an over population of wild horses, but also that removal of these horses is necessary. And that's what can happen five years before they're actually removing them. And then it says it must implement the action immediately. The only case that considers similar actions said that this violates the Wild Horses and Burrows Act in fundamental ways, a phased approach. And that was the Framelands Association, saying the phased approach is not consistent. It was a pilot program and it indicated that they did involve the public in future analysis, but still found the phased approach violated the Wild Horses and Burrows Act there and it does here. Thank you, your honors. Thank you, counsel. The case just argued is submitted and we appreciate helpful arguments from both counsel.
judges: Gilman, Graber, Collins